FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  NOV 16 2018  ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

CANER DEMIRAYAK,

               Plaintiff.

- against -

UNITED HEALTHCARE SERVICES, INC., GEICO
CORPORATION CONSOLIDATED WELFARE
BENEFITS PROGRAM, GEICO INSURANCE
AGENCY, INC., GEICO CORPORATION, PNC
BANK N.A., & THE PNC FINANCIAL SERVICES
GROUP, INC.,
               Defendants.

-------------------------------------------------------------------X

Civil Action No.:

**CIVIL COMPLAINT**

**CV18  6549**

**KUNTZ, J.**

**REYES, JR. M.J.**

NOW COMES the Plaintiff, CANER DEMIRAYAK (hereinafter "Plaintiff"), an attorney admitted to practice law in New York State, Florida State, and the United States District Courts for the Eastern and Southern District of New York, *on his own behalf*, and complains against the Defendants as follows:

### JURISDICTION

1.     This action arises under the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. 1001, *et seq*. As such, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. 1331 & 29 U.S.C. 1132(e).

2.     This is an action under 29 U.S.C. 1132(a)(1)(B) and (a)(3) to recover benefits due to plaintiff, to enforce his rights, and to clarify his rights to future benefits under the terms of the plan. This is also an action under 29 U.S.C. 1132(a)(1)(A) and (c) to recover the penalty owed to plaintiff based on the administrator's refusal to supply requested information within 30 days. This is further an action under 29 U.S.C. 1133 to rectify the defendants' failure to provide adequate notice with the specific reasons for the denials of plaintiff's claim for benefits and the concurrent failure to afford a reasonable opportunity for a full and fair review of the decision denying the

1

claim. In addition, this action arises under 29 U.S.C. 1140 based on GEICO Insurance Agency, Inc. and GEICO Corporation's unlawful actions taken to discipline, discriminate and interfere with plaintiff's exercise and attainment of his rights under the plan and ERISA.

### VENUE

3.     Venue is properly laid in the Eastern District of New York pursuant to 28 U.S.C. 1391(b)(1) as all defendant entities are residents of New York State. Specifically, each defendant is subject to personal jurisdiction in New York as per 28 U.S.C. 1391(c)(2). As such, the defendants are deemed to reside in the Eastern District.

4.     Since plaintiff resides in Long Island, the plan's administrator (GEICO Corporation and GEICO Insurance Agency, Inc.) employs plaintiff in Long Island, has its main headquarters for New York in Long Island, and because the plan was entered into in Long Island and all such mailings from the defendants were received in Long Island, the Central Islip courthouse is properly chosen as per the local rules.

### STATUTE OF LIMITATIONS

5.     The ERISA statute does not prescribe any specific limitations period for the commencement of an action under such law. However, this action was commenced within the applicable 6-year statute of limitations for breach of contract in New York, following exhaustion of all internal appeals with the plan on October 17, 2018.

6.     In addition, the terms of the plan provide for a 1-year statute of limitations period for the commencement of claims under ERISA seeking to challenge denial of claims for benefits. Without conceding or admitting that such limitations period is reasonable – which it clearly is not – this action was also timely commenced in accordance with the unenforceable limitations period set by the terms of the plan, following exhaustion of all internal appeals on October 17, 2018.

## PARTIES

7.    Plaintiff, CANER DEMIRAYAK, is a participant of the GEICO Consolidated Welfare Benefits Program (hereinafter "the Plan") through his employment with GEICO Corporation, which does business in New York through the GEICO Insurance Agency, Inc. Plaintiff requires a customized motorized wheelchair for mobility as he has a progressive muscle wasting disease and cannot walk. Plaintiff is a resident of Nassau County. He works for GEICO Corporation in its legal office located at 100 Duffy Avenue, Suite 500, Hicksville, New York.

8.    Defendant, UNITED HEALTHCARE SERVICES, INC., (hereinafter "UHC") is the third-party claims administrator of the Plan and the insurer of the Plan's funds, which plaintiff and his employer make premium payments to. This defendant is a foreign corporation incorporated in Minnesota and has been authorized to conduct business in New York since November 26, 1990 and conducts business therein. According to the New York State Department of State (hereinafter "DOS") this defendant's agent for service of process is CT Corporation System at 111 Eighth Avenue in New York, New York. Among other minimum contacts, this defendant sells insurance in New York, insures individuals in New York, makes coverage determinations for its New York insureds, and administers that portion of the Plan relating to more than 2,000 Plan participants in New York. Pursuant to the terms of the plan this defendant handles the day-to-day administration of the Plan's coverage as directed by the Plan Administrator pursuant to contract. This defendant has a fiduciary duty to uphold and act in the best interests of plaintiff, a plan participant.

9.    Defendant, GEICO CORPORATION CONSOLIDATED WELFARE BENEFITS PROGRAM, is the Plan which is at issue in this matter and is sued as an entity pursuant to ERISA. This defendant has sufficient minimum contacts with New York as it is controlled, operated, funded and owned by GEICO Corporation and GEICO Insurance Agency, which conduct large scale business in New York. Additionally, this defendant provides coverage to more than 2,000

3

plan participants in New York. This defendant has a fiduciary duty to uphold and act in the best interests of plaintiff, a plan participant.

10.     Defendant GEICO INSURANCE AGENCY, INC., (hereinafter "GIA") is a foreign corporation incorporated in Maryland and has been authorized to conduct business in New York since February 3, 1987 and conducts business therein. According to the DOS this defendant's agent for service of process is CT Corporation System at 111 Eighth Avenue in New York, New York. Among other minimum contacts, this defendant provides and enters into insurance contracts for motor vehicles in New York and provides personal injury protection benefits as required by New York Law. This defendant is a participant and/or administrator or sponsor of the Plan and employs plaintiff and more than 2,000 other employees based in New York. This defendant is owned, maintained, overseen, controlled, held and operated by GEICO CORPORATION and is otherwise a member of the GEICO Group of Companies.

11.     Defendant GEICO CORPORATION (hereinafter "GEICO") is the Plan Sponsor, Administrator and administers such plan through its Benefits Administrative Committee as per the terms of the Plan documents. This defendant is a foreign corporation with principal places of business in Washington, D.C., New York, Florida, Texas, Georgia, and several other States, and conducts business in New York. Among other minimum contacts, this defendant provides and enters into insurance contracts for motor vehicles, homes, boats and motorcycles, as well as personal umbrella policies in New York and provides bodily injury and property damage coverage. In addition, this defendant insures vehicles in all 50 States, which vehicles are often involved in accidents within New York requiring this defendant to provide insurance coverage within the State. Moreover, this defendant employs plaintiff and more than 2,000 other employees based in New York. This defendant is the parent company of defendant, GIA, and otherwise owns, holds,

maintains, funds, operates, and oversees such child or affiliate company. Pursuant to the terms of the Plan this defendant has the discretionary authority to interpret the Plan. As the designated Plan Administrator through its Benefits Administrative Committee, GEICO has a fiduciary duty to uphold and act in the best interests of plaintiff, a plan participant.

12.    Defendant, PNC BANK, N.A., (hereinafter "PNC") is the named trustee of the Plan as per the terms of the Plan. This defendant is a foreign National Association that conducts business in New York through its official legal name of THE PNC FINANCIAL SERVICES GROUP, INC. Among other minimum contacts, PNC, maintains several physical bank branches in New York, performs stock, commodity, and investment transactions through financial advisors, and brokers situated in New York and conducts transactions through the New York State Stock Exchange. As trustee of the Plan's funds, this defendant has a fiduciary duty to uphold and act in the best interests of plaintiff, a plan participant.

13.    Defendant THE PNC FINANCIAL SERVICES GROUP, INC., (hereinafter "PNCFSG") is the trustee of the Plan as per the terms of the Plan by or through its alter-ego or parent/affiliate company of PNC. This defendant is a foreign corporation incorporated in Pennsylvania and has been authorized to conduct business in New York since July 29, 2004 and conducts business therein. According to the DOS, this defendant's agent for service of process is PNC Legal Department at 300 5th Avenue, Pittsburgh, Pennsylvania. Among other minimum contacts, PNCFSG, maintains several physical bank branches in New York, performs stock, commodity, and investment transactions through financial advisors, and brokers situated in New York and conducts transactions through the New York State Stock Exchange. As trustee of the Plan's funds, this defendant has a fiduciary duty to uphold and act in the best interests of plaintiff, a plan participant.

<u>Statement of Facts Applicable to all Causes of Action</u>

14.     On July 25, 2016 plaintiff commenced his employment with GEICO and the GIA, as an attorney in its legal office located in Hicksville, New York.

15.     In October 2016, after plaintiff had been employed for ninety (90) days he elected to join the Plan and selected the UHC Choice Plus health insurance policy. Plaintiff re-enrolled in the Plan's Choice Plus health insurance policy effective January 1, 2017[1].

16.     On October 12, 2017 Plaintiff visited with Dr. Jeffrey Cohen, a physical medicine and rehabilitation doctor at NYU Rusk Institute and attending physician to the Muscular Dystrophy Association Clinic at Rusk. Dr. Cohen has been plaintiff's treating physical medicine and rehabilitation doctor for plaintiff's muscular dystrophy since at least 2008. During this visit Dr. Cohen prescribed Plaintiff for a new wheelchair evaluation.

**I.     Medically Necessary Wheelchair Evaluation**

17.     On January 31, 2018 Plaintiff visited with an occupational therapist in the wheelchair clinic at Southside Hospital in Suffolk County, New York. During this more than three (3) hour evaluation plaintiff was examined for the need of a new motorized wheelchair and the medically necessary electronic and physical accessories.

18.     On February 20, 2018 Plaintiff again visited with the occupational therapist in the wheelchair clinic at Southside Hospital, along with an assistive technology provider (hereinafter "ATP") who is certified through the Rehabilitation Engineering and Assistive Technology Society of North American (hereinafter "RESNA") to properly fit and  set up plaintiff for the wheelchair that was determined to be necessary during the earlier wheelchair clinic evaluation.

---

[1] Each subsequent year, Plaintiff also re-enrolled effective January 1, 2018 and January 1, 2019.

19.     During the February 20, 2018 visit, Plaintiff was provided with a TDX-SP2 wheelchair including all accessories and electronic components deemed medically necessary to use, and to determine the need for such chair in such a test run. Plaintiff then drove the wheelchair around the clinic and tested the tilt, recline and seat elevator in various medically necessary situations. For instance, plaintiff went into various offices with high cabinets and discovered the medical benefits of the seat elevator in reaching items. Plaintiff further discovered the medical benefits of the seat elevator when transferring to toilets, patient tables, and beds of various heights. Additionally, plaintiff went up to different persons in the clinic and spoke with them at eye level with the seat elevator, discovering the psychological benefits of the seat elevator.

20.     On April 17, 2018 Plaintiff visited with Dr. Adam Stein at the occupational therapy and rehabilitation medicine division of Southside Hospital. Dr. Stein previously oversaw and directed the earlier wheelchair clinic and ATP evaluations. Plaintiff spent much time with Dr. Stein going over the medical necessity of the new motorized wheelchair with the accessories, including the seat elevator and touch screen remote. After considering, among other things, plaintiff's medical history, diagnosis of Becker's muscular dystrophy, status as a wheelchair bound person, an examination, and all other relevant information gleaned from the wheelchair clinic and ATP evaluation, Dr. Stein determined the requested wheelchair, seat elevator and touchscreen remote, to be medically necessary and clinically appropriate.

21.     Dr. Stein's determination was informed by the generally accepted principle that seat-elevating devices on wheelchairs serve many appropriate medical purposes and are otherwise medically necessary. In "RESNA Position on the Application of Seat-Elevating Devices for Wheelchair Users," published in Assistive Technology in 2009, and co-authored by an assortment of ATPs and occupational therapists, it is stated that: "It is RESNA's position that seat elevators

are often medically necessary for wheelchair users by enabling them to reach, improving MRADL abilities, facilitating or enabling transfers, providing peer height at different ages, enhancing independent and productivity, and delaying or preventing pain and secondary complications of the upper extremities." It should be noted that RESNA is a not-for-profit membership organization founded in 1979. The Plan's terms and policies for wheelchairs *require* that a participant receive a specialty evaluation by a RESNA certified ATP to show entitlement to power seating options. As such, RESNA provides the gold standard in determining medical necessity for power seating.

## II.   Initial Improper Denial of Entire Claim

22.   On April 25, 2018 a pre-service claim was submitted to and received by UHC, for the customized group 3 multiple power option wheelchair. As relevant to this proceeding, this request included, among other things, the following parts: a seat elevator, recline arm rests, foam arm pads, center mounted footplate, and a color touch screen remote.

23.   On April 27, 2018 the claim was noted to have been received in the intake department.

24.   On April 30, 2018 the claim was transferred to the nurse work queue at United Healthcare Services, Inc. The requested wheelchair, along with all customization options was quoted at a total price of $21,091.68.

25.   On May 3, 2018 Gwendolyn Patton Rollins, RN, recommended denial of all requested durable medical equipment codes and denial of the entire customized wheelchair as not medically necessary or beyond the benefits offered by the Plan. Specifically, Nurse Rollins based the recommended denial on the fact plaintiff already has a wheelchair, that plaintiff did not provide a cost estimate of what it would take to repair his current wheelchair, and because "parts" of the wheelchair do not serve a medical purpose and are more than is needed for basic services.

26.     On May 10, 2018 Dr. David Coffey, D.O., J.D., an emergency medicine physician agreed with the recommendation to deny because there were "too many codes to modify with power seating and miscellaneous upgrades" and because no estimate was provided for repairs to plaintiff's current wheelchair. As such, Dr. Coffey decided to "deny all" codes requested.

27.     At some point during the initial claims handling process Nurse Rollins and/or the claim handler requested the vendor of the wheelchair to provide documents showing why plaintiff's current wheelchair no longer functions "tests or office notes to aid in the appeal." The claim file notes that a deadline of January 1, 2018 was set for providing such documents, but that date had already past months earlier. As of this date it is unclear if this request for additional documents was actually made and plaintiff was never contacted regarding same. In any event, this is not required by the Plan terms and was an improper request.

28.     The denial by Dr. Coffey for the entire customized wheelchair was received by plaintiff on May 18, 2018. The denial letter advised plaintiff that he may request copies of any documents relied upon in making the denial determination.

### III.     Improper Handling of Request for Documents as a First Level Appeal

29.     As such, in accordance with the terms of the denial, on May 21, 2018 plaintiff mailed a letter addressed to Central Escalation Unit, Attn: Document Requests in Duluth, Minnesota requesting each and every item and document relied upon in rendering the denial. No where in the May 21, 2018 did plaintiff mention an appeal or even claim to be appealing. The letter was also not mailed to the Appeals Unit as described in the denial letter, located in Salt Lake City, Utah. Instead, plaintiff merely requested documents review prior to preparing a strong appeal within the 180-day timeframe for doing so.

30.     On June 1, 2018 UHC, received plaintiff's letter requesting the documents relied upon in the denial. However, the letter was construed by UHC, as a first level appeal by CAT coordinator "Alberto."

31.     On June 11, 2018 plaintiff's letter request for documents was forwarded to Amy Dark, RN in the clinical appeals department. Although the plaintiff's letter was clearly not an appeal, RN Dark recommended denial of the appeal based on the fact that the requested wheelchair was not the most cost-effective wheelchair.

32.     On June 12, 2018 Nurse Dark forwarded plaintiff's letter requesting documents to Dr. Trinh Tran in the appeals department for a final decision.

33.     Although the plaintiff's letter was clearly not an appeal, on June 14, 2018, Dr. Tran decided to deny the appeal and uphold the initial denial because no information was provided as to plaintiff's current wheelchair, the power recline, and elevator system is not medically needed and does not serve medical purposes, and because the wheelchair requested is not the most basic wheelchair.

**IV.     Unilateral Withdraw of Appeal Denial and Late Provision of Documents**

34.     On June 19, 2018 plaintiff filed an actual appeal of the initial denial since it was clear his request for documents was rejected and mischaracterized as an appeal and denied. In relevant part plaintiff argued that his current wheelchair was discontinued, obsolete and not repairable. In support of this incontrovertible position plaintiff attached a June 19, 2018 e-mail from Vicki Hreha of Invacare Corporation confirming plaintiff's model wheelchair was discontinued in December 2016. Plaintiff also attached a copy of the document and chart published by Invacare confirming the wheelchair was discontinued. In addition, plaintiff attached the consent injunction which prohibited Invacare from producing or repairing plaintiff's model wheelchair in

the civil enforcement action commenced in the Northern District of Ohio styled as *United States of America v Invacare Corporation*, 12-cv-3086.

35. Plaintiff further argued that all requested portions of the wheelchair satisfied the requirements for durable medical equipment under the Plan and also satisfied each requirement for a medially necessary service. The plaintiff made clear that UHC had failed to provide him with requested documents and would be subject to a civil penalty in a contemplated ERISA lawsuit.

36. On June 27, 2018 UHC sent plaintiff a letter to "correct" its June 14, 2018 denial letter. UHC stated that upon further review the letter initial sent by plaintiff on May 21, 2018 was not an appeal and should not have been considered as such.

37. In another letter dated June 27, 2018 UHC admitted it mischaracterized plaintiff's letter requesting documents as an appeal. Thus, UHC withdrew its appeal denial and forwarded plaintiff's request for documents for processing. UHC further stated it would reject plaintiff's June 19, 2018 appeal and require him to refile same.

38. On July 28, 2018 plaintiff finally received a CD-ROM containing some of the documents initial requested on May 21, 2018. The letter included in the CD-ROM mailer was dated July 16, 2018 but was not post marked until July 25, 2018. For some reason the CD-ROM only contained select pages of the Summary Plan Description (only 8 of 115 pages) and did not provide all documents and notes relied upon in the determination. UHC did not provide any notes from the Register Nurses and Doctors involved in the denial or any medical or clinical literature relied upon.

## V. First Level Appeal Refiled

39. Due to uncertainty as to the remaining time left to file an appeal, since plaintiff's initial appeal of June 19, 2018 was rejected for no reason, plaintiff immediately refiled a first level

appeal on August 3, 2018. This appeal was substantially similar to the June 19, 2018 appeal letter and incorporated new information learned from a review of the requested documents.

40.     On August 24, 2018, UHC partially overturned the initial denial and approved coverage for a group 3 multiple power option wheelchair, power tile and recline seating, and an expandable controller. This appeal was again determined by Dr. Tran, who previously determined the appeal, which decision was withdrawn on June 27, 2018. This was against the terms of the Plan and ERISA which require a different doctor to determine each appeal.

41.     However, UHC still denied the seat elevator on the basis it does not serve a medical purpose. UHC also denied coverage for arm pads, foot plate, headrest pads, seatbelt, hip supports, recline arm rests, and touch screen remote as "already included in the base chair" and cannot be requested separately.

42.     Strangely the partial denial was based in part on the inapplicable exclusion for *prosthetic devices* which are "used specifically as safety items or to affect performance in sports related activities." This was a wrong exclusion to rely upon as the clear terms of the Plan separate durable medical equipment from prosthetics and renders each set of exclusions inapplicable to the other category of medical equipment. This was in addition to the lack of any basis to claim the items were for safety or for a sporting activity. Plaintiff does not play sports (trial law is not a "sport" despite how exhilarating and competitive as it might be).

VI.     **Second Level Appeal**

43.     On September 26, 2018 plaintiff filed a second level appeal challenging denial of the seat elevator and the integral parts to the wheelchair. Plaintiff relied upon the Plan terms and durable medical equipment policy that states a seat elevator can be covered as medically necessary where a tilt and recline system was also covered – as was covered in the partial denial reversal.

44.     There is no specific exclusion in the Plan and policy documents as to seat elevators. There is also no specific standard set forth for determining whether a seat elevator is medically necessary or serves a medical purpose. Instead, this is determined in the Plan by reference to the standard for necessity of a tilt and recline power seating system indirectly.

45.     On page 5 of 15 of the LCD information, it is stated that a power seat elevator can be covered as medically necessary and appropriate if the claimant meets the criteria for a power recline/tilt and had a specialty evaluation by an occupational therapist and ATP. This language appears only in the section for group 2 single power option wheelchairs. In addition, with reference to the specific standard for tilt and recline seating, the Plan states coverage for a seat elevator can come with it.

46.     Notably, no such language is found within the section for group 3 multiple power option chairs. This is likely because if a multiple power option chair and a tilt/recline seating system is approved, there would be no medically appropriate reason to deny coverage for a seat elevator. Regardless, if a claimant can satisfy the requirements for a lower standard (group 2) and only single option power chair, it would be arbitrary to deny a seat elevator for a higher standard and multiple option power chair. In any event, plaintiff clearly meets the two requirements for a power seat elevator as stated in the Plan for a less complex wheelchair.

47.     The reason why the determination of whether to cover a seat elevator centers around approval of a tilt and recline system is because Invacare, as with most other wheelchair suppliers bases its entire power seating system on a tilt and recline feature. A seat elevator is an additional feature to be added – an upgrade – to the already implemented power seating system providing function to the tilt and recline system. Approving one of these power features should render the other medically necessary since the terms of the Plan are silent as to group 3 multiple power option

chairs but is clear on what is needed on a group 2 single power option chair. It is fundamental common sense. However, the flawed basis for the initial denial and each subsequent appeal is exposed by Dr. Coffey's note in the claim file that there are "to many codes to modify the order with the power seating." However, there is no need to modify a medically necessary feature.

48.     In addition, UHC's claim that several necessary parts to the wheelchair are already included is just plain wrong. The order form for the wheelchair from Invacare establishes that each part must be separately ordered, customized and purchased. Thus, UHC literally approved a wheelchair seat, wheels, and a tilt and recline system but nothing else. The denial of a foot plate, arm rests and pads, head rests, **SEAT BELT**, and remote for controlling the complex wheelchair is so arbitrary it shocks the conscience.

49.     Despite the valid arguments made by plaintiff on October 17, 2018 UHC denied the second level appeal and maintained its partial denial. UHC again relied upon the inapplicable and inappropriate prosthetic device exclusion for "devices specifically for safety or sporting activities." The denial of the second level appeal by Dr. Arvin Gallanosa contined to provide a conclusory basis for the denial: that the seat elevator provides no medical purpose without explaining why and how it reached that determination. Dr. Gallanosa also reiterated the plainly wrong denial for coverage of integral parts to the wheelchair.

## VII.    Final Request for Documents Prior to Commencement of Suit

50.     On October 25, 2018 plaintiff mailed a letter to UHC and GEICO requesting the documents relied upon in the denial of the first and second level appeals as permitted by the terms of the October 17, 2018 second level appeal denial letter. Plaintiff's letter was received by UHC on October 28, 2018.

**VIII.   Unilateral Changes to Prior Partial Denial and Payments Made by Plaintiff**

51.   On October 30, 2018, UHC verbally reconsidered its partial denial during several phone conversations with the wheelchair vendor. It unilaterally decided to amend its prior denials and opened a second case. However, UHC still maintained its denial of the seat elevator, recline arm rests, foam arm pads, center mounted footplate, and a color touch screen remote.

52.   On October 30, 2018 plaintiff issued a check to the wheelchair vendor in the amount of $2,822.42. This constitutes half of the amount the defendants wrongfully failed to cover. On the date the wheelchair is delivered to plaintiff, plaintiff will issue a second check for the remaining $2,822.42 for the wrongfully denied portions of the wheelchair, for a total amount of $5,644.84.

**IX.   Second Improper Handling of Document Request as an Appeal**

53.   On November 1, 2018 UHC sent plaintiff a letter acknowledging receipt of his document request letter of October 25, 2018, but again construed same to be an appeal.

54.   On November 5, 2018 plaintiff spoke with Shaniya from claims and Sharon in clinical appeals at UHC. They confirmed they received my document request and would respond. However, she acknowledged it was currently being considered as an appeal and that she had no further information to provide plaintiff.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

55.   Plaintiff repeats and realleges paragraphs numbered "1" through 54" as if fully set forth herein.

56.   The Defendants' determination that the seat elevator for plaintiff's motorized wheelchair serves no medical purpose and is not medically necessary was arbitrary and capricious – that is – without reason, unsupported by substantial evidence and erroneous as a matter of law. Defendants' determination that the recline arm rests, foam arm pads, center mounted footplate,

and a color touch screen remote cannot be covered because same are already included in the motorized wheelchair, was likewise arbitrary and capricious.

57.     The Defendants decision was not based on a consideration of the relevant factors and evinces a clear error of judgment. The Defendants imposed standards not required by the Plan's provisions and otherwise interpreted the Plan in a manner inconsistent with its plain words. The Defendants also arbitrarily refused to credit the Plaintiff's reliable evidence, and the opinions of Plaintiff's treating physician, therapist and ATP without any reasonable basis.

58.     In this matter the court must apply a heightened standard of review because the defendants have operated the Plan under a conflict of interest. Specifically, UHC both makes claim determinations *and* insures the Plan's benefits, and otherwise issues payments of benefits. Although GEICO retains the right to interpret the Plan, the Supreme Court teaches that UHC is clearly operating under a conflict here. In addition, as described above the procedures employed by UHC and the other defendants in arriving at the claim determination were flawed.

59.     Moreover, the facts described above demonstrate that the Defendants committed and allowed numerous procedural irregularities and abnormalities to infect and taint the claims handling process here, further mandating a heightened standard of arbitrary and capricious review.

60.     As such, pursuant to 29 U.S.C. 1132(a)(1)(B) and (a)(3) Plaintiff is entitled to recover the cost of the seat elevator, recline arm rests, foam arm pads, center mounted footplate, and a color touch screen remote as provided for under the Plan's terms and health insurance policy.

### AS AND FOR A SECOND CAUSE OF ACTION

61.     Plaintiff repeats and realleges paragraphs numbered "1" through "60" as if fully set forth herein.

62.     The Defendants' failure to provide the duly requested and required documents relevant to and relied upon in making the erroneous claim denial within thirty (30) days of receipt

of the request violated the ERISA statute and regulations implementing same. *See* 29 U.S.C. 1024(b)(4); 29 CFR 2560.503-1(h)(2)(iii) & (m)(2). The Defendants' refusal to provide such documents in a timely manner was designed to and had the effect of harming and delaying Plaintiff's claims for no valid reason.

63.     Even after the Defendants' decided to finally provide the requested documents – albeit 57 days late – they continued to refuse to provide all documents relied upon and relevant to the claim denial. Specifically, the Defendants only provided 8 out of 115 or so pages of the Summary Plan Description, did not provide any information on how claims are paid, nor provide any documents or notes relied upon by the doctors and nurses in reaching their determination that the seat elevator served no medical purpose, for at least 120 days and counting.

64.     As such, pursuant to 29 U.S.C. 1132(a)(1)(A) & (C) and 29 CFR 2560.503-1, Plaintiff is entitled to a penalty of up to $110 per day for each day the Defendants refused to provide the duly requested documents. The amount of the penalty should be higher here because of the blatant procedural violations and harmful delay caused by the refusal to provide documents.

### AS AND FOR A THIRD CAUSE OF ACTION

65.     Plaintiff repeats and realleges paragraphs numbered "1" through 64" as if fully set forth herein.

66.     Plaintiff is entitled to injunctive and equitable relief and limited discovery based on the Defendants' failure to provide adequate notice and specific reasons for the denial of the seat elevator by merely stating it "serves no medical purpose" and is considered a "safety device or used for sporting activities," without any explanation or reasoning as to how this denial was reached. The Plaintiff is also entitled to injunctive and equitable relief and limited discovery as the Defendants' failed to provide plaintiff with a full and fair review of his claim for the seat elevator by the blatant procedural defects in the handling, withdrawal of prior appeal denials, improper

handling of letters for document requests and considering same as appeals, requiring plaintiff to refile properly filed appeals, using the same doctor to consider separate appeals, and conducting a biased review.

67.     As such, pursuant to 29 U.S.C. 1133, the Defendants should be required to produce limited discovery from the claims' representatives, registered nurses and doctors involved in the inadequate and unfair determinations, such discovery to aid in determining whether the determinations were arbitrary and capricious. Also, the Defendants must be compelled to provide the specific reasons for their determination that the seat elevator "serves no medical purpose," and that several other integral parts to the wheelchair are already included in the requested wheelchair. The Defendants must also be compelled to create new procedural rules and safeguards to ensure full and fair determinations going forward.

### AS AND FOR A FOURTH CAUSE OF ACTION

68.     Plaintiff repeats and realleges paragraphs numbered "1" through "67" as if fully set forth herein.

69.     GEICO and GIA, by and through several of their agents have interfered with Plaintiff's attainment of rights under ERISA and the Plan with respect to the customized motorized wheelchair. GEICO and GIA, by and through several of their agents have also discriminated against plaintiff herein.

70.     Specifically, on or about March 15, 2018 plaintiff filed a human resource (hereinafter "HR") complaint accusing his supervisor of retaliation and discrimination on the basis of disability relating to telecommuting during snow storms and other issues, including participation in an ADA access lawsuit against the New York State and City court system. *See Demirayak v City of New York*, 17-cv-5205 (WFK) (RER) & *Demirayak v DeBlasio*, 18-cv-4723 (WFK) (RER).

After the complaint was filed, HR began to attempt to "paper the file" but was unable to find anything it could use as a pre-textual reason to take adverse action against Plaintiff.

71.     On March 30, 2018 Plaintiff met with the Director of his region of GEICO and GIA. During the meeting Plaintiff was threatened with possible termination. Thus, plaintiff discussed his pending wheelchair order. In response the Director laughed and advised he "did not know what to say" in response. When asked if Plaintiff would be terminated from employment the Director advised Plaintiff had "passed the point of no return" and that I would be contacted in the near future. Several days later a complaint with the Equal Employment Opportunity Commission (hereinafter "EEOC") was filed. As of this date, the EEOC complaint is being investigated, with possible future litigation if mediation fails.

72.     When considering the numerous procedural abnormalities, reliance on inapplicable exclusions and the obvious abusive and arbitrary claims process herein, it is clear that GEICO and GIA have sought to interfere in plaintiff's claim and to discriminate against him. As indicated above GEICO is the Plan sponsor, administrator and funder.

73.     As such, pursuant to 29 U.S.C. 1132(a)(3) and 1140, GEICO and GIA must be Ordered to cease from any attempts to interfere in plaintiff's claim or to discriminate against him. Such defendants should also be compelled to provide limited discovery as to the interference and discrimination issues to aid in determining whether the claims' decision was arbitrary and capricious. In addition, GEICO and GIA should be ordered to pay nominal damages of one (1) dollar and be required to personally cover the cost of the denied portion of plaintiff's wheelchair and any co-insurance paid by plaintiff.

### As and For a Fifth Cause of Action

74.     Plaintiff repeats and realleges paragraphs numbered "1" through 73" as if fully set forth herein.

75.     Plaintiff is entitled to recover all litigation costs, expenses, fees, and costs of this action as per 29 U.S.C. 1132(g)(1).

76.     Plaintiff at this time is proceeding *pro se* and should he retain counsel he will incur attorney's fees which Defendants must also pay as per 29 U.S.C. 1132(g)(1).

**WHEREFORE**, Plaintiff demands judgment against Defendants:

I.      For the amount of benefits due to plaintiff, of at least, and not limited to, **$5,644.84**, to cover the wrongly denied medically necessary wheelchair seat elevator and several medically necessary accessories;

II.     Ordering defendants to provide coverage for the medically necessary wheelchair seat elevator and several medically necessary accessories;

III.    For a penalty in the amount of up to $110 per day for the failure to timely provide the required requested documents over at least, and not limited to, 57 days[2] for a total penalty of approximately **$6,270**;

IV.     Ordering Defendants to cease from discriminating against plaintiff and interfering in the exercise and attainment of his rights under ERISA and the Plan;

V.      Declaring that the defendants have violated ERISA and/or the terms of the Plan pursuant to the Declaratory Judgment Act, 28 U.S.C. 2201, *et seq.*;

VI.     Awarding plaintiff the costs, expenses, disbursements and fees incurred in commencing and prosecuting this action; or

---

[2] On July 28, 2018 United Healthcare Services Inc., purported to provide plaintiff with the Summary Plan Description (hereinafter "SPD"), but only included eight (8) pages of the more than 115-page document (pages 37, 38, 39, 74, 75, 85, 100, and 115). This was a clear violation of ERISA and the terms of the Plan which defines the SPD as a summary of who is eligible, services that are covered, services that are not covered, how benefits are paid, and your rights and responsibilities under the plan. The 8 meager pages provided do not include any summaries on how benefits are paid and rights and responsibilities. Since the request was received on June 1, 2018 and due by July 1, 2018, as of this date the defendants have failed to provide required requested documents for more than **120 days**. Assuming the full penalty would be imposed, this would require the defendants to pay plaintiff **$13,200**. The plaintiff demands judgment in such amount as well. Plaintiff in commencing this action was denied information on how benefits are paid, which is fundamental to an understanding of what standard of review this court must utilize in this action.

VII.    For such other and further relief that to this court seems just and proper.

Dated: November 14, 2018
        North Massapequa, New York

RESPECTFULLY SUBMITTED,

CANER DEMIRAYAK, ESQ.
P.O. Box 1537
N. Massapequa, New York 11758
516-765-0570
canerdemirayak@outlook.com
EDNY Bar No.: CD7920

To:

United Healthcare Services, Inc.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011
&
9900 Bren Road East
Minnetonka, Minnesota 55343
*via Secretary of State if waiver refused*

GEICO Insurance Agency, Inc.
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011
&
1 Geico Plaza
Washington, D.C. 20076
*via Secretary of State if waiver refused*

PNC Bank, N.A.
800 17th Street, N.W.
Washington, DC 20006
*via Personal Service if waiver refused
as per New York Long Arm Statute*

GEICO Corporation Consolidated Welfare Benefits
Program
c/o GEICO Corporation
1 Geico Plaza
Washington, D.C. 20076
*via Personal Service if waiver refused as per New
York Long Arm Statute*

GEICO Corporation
1 Geico Plaza
Washington, D.C. 20076
*via Personal Service if waiver refused as per New
York Long Arm Statute*

The PNC Financial Services Group, Inc.
c/o PNC Legal Department
300 5th Avenue
Pittsburgh, Pennsylvania, 15222-2401
*via Secretary of State if waiver refused*

# Exhibit "A"

*Assistive Technology*®, 21:69–72, 2009
Copyright © 2009 RESNA
ISSN: 1040-0435 print / 1949-3614 online
DOI: 10.1080/10400430902945587



# RESNA Position on the Application of Seat-Elevating Devices for Wheelchair Users

Julianna Arva, MS,[1] Mark R. Schmeler, PhD, OTR/L, ATP,[2] Michelle L. Lange, OTR, ABDA, ATP,[3] Daniel D. Lipka, MEd, ATP, OTL,[4] and Lauren E. Rosen, PT, MPT, ATP[5]

[1]TiLITE Corp., Kemmerich, Washington
[2]Department of Rehabilitation Science & Technology, University of Pittsburgh, Pittsburgh, Pennsylvania
[3]Access to Independence, Inc., Arvada, Colorado
[4]Tobii Assistive Technology, Inc., Medina, Ohio
[5]St. Joseph's Children's Hospital of Tampa, Tampa, Florida

**ABSTRACT**   This document, approved by the Rehabilitation Engineering & Assistive Technology Society of North America (RESNA) Board of Directors in September 2005, shares typical clinical applications and provides evidence from the literature supporting the use of seat-elevating devices for wheelchair users.

**KEYWORDS**   power features, rehabilitation, seat elevation, wheelchair

## INTRODUCTION

The purpose of this article is to share typical clinical applications as well as provide evidence from the literature supporting the application of seat-elevating devices to assist practitioners in decision making and justification. It is not intended to replace clinical judgment related to specific client needs.

## BACKGROUND

Wheelchair mobility is often only considered from the perspective of people moving from one point to another on a two-dimensional plane (Arva & Schmeler, 2004). Vertical movement is necessary in order for people to function and participate in a three-dimensional world. A common intervention that provides vertical mobility within a wheelchair is a seat-elevating device. It is RESNA's position that seat elevators are often medically necessary to assist individuals accomplish mobility-related activities of daily living tasks (MRADLs).

## Definition

A seat elevator will raise and lower users in their seated position through the use of an electromechanical lift system, without changing the seated angles or the seat's angle relative to the ground, in order to provide varying amounts of added vertical access. A seat elevator may elevate vertically from a standard seat height or may lower the user closer to the floor. Seat elevating devices address several medical needs, as follows.

Address correspondence to Mark R. Schmeler, PhD, OTR/L, ATP, Director, Continuing Education Program & VA Polytrauma Rehabilitation Assistive Technology Program, University of Pittsburgh, Department of Rehabilitation Science & Technology, 5044 Forbes Tower, Pittsburgh, PA 15260. E-mail: schmeler@pitt.edu

## Transfers

Transferring from a wheelchair to other surfaces such as a bed, toilet, or other surface is a necessary part of the daily routine. Transferring is a means to accomplish MRADLs, and therefore it is considered a medical necessity. Seat-elevating devices can facilitate safer and more independent transfers by elevating or lowering the seated height of the wheelchair. Examples of this application include but are not limited to the following:

- A wheelchair user is more readily able to transfer in a downhill direction using a sliding board versus uphill or to a level surface. In the downhill direction gravity assists as opposed to providing additional resistance and difficulty, as in the uphill direction.
- Transferring in a downward direction requires less upper extremity strain (Wang et al., 1994).
- Individuals with lower extremity weakness have difficulty assuming a standing position for transfers from a low seat to floor height. Rising from an elevated seat surface has been shown to require less lower extremity strength and less extension momentum at the knees, ankles, and the hips (Alexander et al., 2001; Brattstrom et al., 1981; Burdett et al., 1985; Edlich et al., 2003; Janssen et al., 2002; Rodosky et al., 1989; Weiner et al., 1993). It also takes longer to rise from a lower seat surface (Alexander et al., 1996). The use of a seat-elevating device to compensate for lower extremity weakness can assist with transfers, therefore prolonging independence. Examples of such transfers include a stand pivot transfer, unassisted or with assistance.
- A seat that lowers to the floor allows some users to transfer into and out of the seat independently onto the floor or to any lower surfaces, such as a therapeutic mat table. Children or people with absent or unusually short extremities can benefit from this feature, which enables them to transfer independently yet maintain a normal seated height to access everyday surfaces such as tables.

## Reach

For individuals with limited reaching abilities, a seat-elevating device may be necessary for access to objects and surfaces within their home, work, school, and community, thus improving their independence and decreasing their dependence on others. Many of these objects and surfaces are necessary to complete MRADLs (e.g., hygiene, meal preparation, parenting, and shopping). Such areas include, but are not limited to, cabinets, sinks, grocery shelves, fire alarms, light switches, medicine cabinets, stovetops, thermostats, and service counters. Improved reach can also significantly increase people's ability to perform work- and school-related activities and their potential for integration and productivity.

Seat elevators may also help reduce upper extremity pain and help delay secondary complications to the shoulders. Studies have found an association between overhead activity and the development of shoulder pain and shown that the degree of upper arm elevation is one of the most important parameters influencing shoulder muscle load (Herberts et al., 1984; Jarvholm et al., 1991; Palmerud et al., 2000; Sigholm et al., 1984). When reaching from an elevated position, these loads are reduced, which is significant for individuals with already compromised upper extremity strength and range of motion.

## Psychological Considerations

Seat elevating devices also provide other benefits, including the following:

- Eye-to-eye conversations are more socially appropriate and improve a person's ability to participate in social activities.
- Communication on level height may improve people's self-confidence, thereby increasing their chance of success.
- Vertical mobility can raise society's expectations of wheelchair users and provide them with a more equal chance for success.

## Additional Physiological Aspects

When talking at eye level with others, typical hyperlordotic cervical curvatures of the spine can be reduced. This relieves strain on the neck and may help enhance vision, thus helping to prevent secondary complications.

An elevating seat may also allow a person in a wheelchair to hear and engage in conversations within a noisy environment, as well as to see and navigate more safely through a crowd of people.

## Pediatric Considerations

An elevating seat allows children to transverse all vertical environments necessary to satisfy their learning needs, both from a psychological perspective and to improve physical abilities such as performing MRADLs. Children can particularly benefit from elevating seats in the following ways:

- Children learn spatial relationships and basic concepts by moving their bodies through space, which needs to include all dimensions.
- Language development comes from interaction, and young children have interactions with peers and adults at many different levels.
- It is necessary to be at peer level for social and cognitive development and to avoid learned helplessness (Safford & Arbitman, 1975). Seat to floor height for normal activities is recommended to be low due to the small size of the child. A seat that lowers to the floor can also provide access to peer activities.
- Low seat to floor height may also assist in stand pivot transfers, since small children have shorter lower extremities.
- A seat elevator allows for maintenance of low seat to floor height, yet provides reach and access to "adult" environments such as dining tables, kitchen counters, and bookshelves. These areas are readily accessible for normally developing children as soon as they start walking and climbing. Use of elevating and/or lowering seats may relieve the necessity to purchase additional equipment purely for integration purposes.

## SUMMARY

It is RESNA's position that seat elevators are often medically necessary for wheelchair users by enabling them to reach, improving MRADL abilities, facilitating or enabling transfers, providing peer height at different ages, enhancing independence and productivity, and delaying or preventing pain and secondary complications of the upper extremities.

## CASE EXAMPLES

Sally is a 67-year-old woman with osteogenesis imperfecta, right below-knee amputation, limited active shoulder flexion to 100 degrees, and short stature (5 feet tall). She uses a power wheelchair due to upper extremity weakness and concerns with pathological fractures. She lives alone in an accessible apartment and is independent with all MRADLs using the power wheelchair and seat elevator. She requires the seat elevator to perform sliding board transfers in a downhill direction as she does not have adequate upper extremity strength to slide herself across a level surface or uphill. She also requires the seat elevator to reach and carry out tasks at different surface heights, specifically stovetop cooking and getting objects out of her cupboards. Without the seat elevator, she would not be able to transfer herself or perform her necessary MRADLs and would have to be living in a facility where she could receive assistance.

Jim is a 42-year-old man with spastic quadriplegic cerebral palsy. He spends approximately 16 hours a day in his wheelchair, which he uses for all home, work, and social activities. With the help of a seat elevator, he can reach objects in his home environment as well as all outside environments. In addition, by scooting forward, elevating the seat, and stepping down to the ground, supporting himself by the seat from behind, he is able to use a public urinal. He can than lower the seat and sit back into position. This ability saves him about 30 minutes a day, as compared to the need to get assistance and transfer onto an accessible toilet seat. This method also enables him to transfer independently without falling. Jim's MRADL abilities, independence, and safety have significantly improved since he began using the seat elevator, and he became a more productive and less dependent member of society.

Jennifer is a 3-year-old girl with spinal muscular atrophy. Due to weakness in both her upper and lower extremities, she utilizes a power chair for mobility. She attends a mainstream preschool, where she integrates into all activities by elevating and lowering her seat as needed. With these features she can cover all vertical ranges; she is on the floor for circle time, she can lower to preschool tables, and she can elevate to reach objects. This integration lessens her self-consciousness, enabling her to communicate and play with the other children, gain self-confidence, and develop her independence. In the home environment, she is given MRADLs to accomplish without help, so she develops a sense of independence and motivation like all other children. Through the use of the elevating and lowering feature, Jennifer has the potential to be more active and independent as an adult.

## ACKNOWLEDGMENTS

This article was developed through RESNA's Special Interest Group in Seating and Wheeled Mobility (SIG-09) and approved by the RESNA Board of Directors. RESNA is an interdisciplinary association of people with a common interest in technology and disability. RESNA's purpose is to improve the potential of people with disabilities to achieve their goals through the use of technology. RESNA serves that purpose by promoting research, development, education, advocacy, and provision of technology and by supporting the people engaged in these activities.

## REFERENCES

Alexander, N. B., Gross, M. M., Medell, J. L., & Hofmeyer, M. R. (2001). Effects of functional ability and training on chair-rise biomechanics in older adults. *Journal of Gerontology, Series A, Biological Sciences and Medical Sciences, 56*, 538–547.

Alexander, N. B., Koester, D. J., & Grunawalt, J. A. (1996). Chair design affects how older adults rise from a chair. *Journal of the American Geriatric Society, 44*, 356–362.

Arva, J., & Schmeler, M. (2004). *Vertical mobility: An overlooked necessity.* Paper presented at the 20th International Seating Symposium, Vancouver, Canada.

Brattstrom, M., Brattstrom, H., Eklof, M., & Fredstrom, J. (1981). The rheumatoid patient in need of a wheelchair. *Scandinavian Journal of Rehabilitation Medicine, 13*, 39–43.

Burdett, R. G., Habasevich, R., Pisciotta, J., & Simon, S. R. (1985). Biomechanical comparison of rising from two types of chairs. *Physical Therapy, 65*, 1177–1183.

Edlich, R. F., Heather, C. L., & Galumbeck, M. H. (2003). Revolutionary advances in adaptive seating systems for the elderly and persons with disabilities that assist sit-to-stand transfers. *Journal of Long Term Effects of Medical Implants, 13*, 31–39.

Herberts, P., Kadefors, R., Hogfors, C., & Sigholm, G. (1984). Shoulder pain and heavy manual labor. *Clinical Orthopaedics & Related Research*, 166–178.

Janssen, W. G., Bussmann, H. B., & Stam, H. J. (2002). Determinants of the sit-to-stand movement: A review. *Physical Therapy, 82*, 866–879.

Jarvholm, U., Palmerud, G., Karlsson, D., Herberts, P., & Kadefors, R. (1991). Intramuscular pressure and electromyography in four shoulder muscles. *Journal of Orthopaedic Research, 9*, 609–619.

Palmerud, G., Forsman, M., Sporrong, H., Herberts, P., & Kadefors, R. (2000). Intramuscular pressure of the infra- and supraspinatus muscles in relation to hand load and arm posture. *European Journal of Applied Physiology, 83*, 223–230.

Rodosky, M. W., Andriacchi, T. P., & Andersson, G. B. (1989). The influence of chair height on lower limb mechanics during rising. *Journal of Orthopaedic Research, 7*, 266–271.

Safford, P. L., & Arbitman, D. C. (1975). *Developmental intervention with young handicapped children.* Springfield, IL: Charles C Thomas.

Sigholm, G., Herberts, P., Almstrom, C., & Kadefors, R. (1984). Electromyographic analysis of shoulder muscle load. *Journal of Orthopaedic Research, 1*, 379–386.

Wang, Y. T., Kim, C. K., Ford, H. T., & Ford, H. T., Jr. (1994). Reaction force and EMG analyses of wheelchair transfers. *Perceptual & Motor Skills, 79*, 763–766.

Weiner, D. K., Long, R., Hughes, M. A., Chandler, J., & Studenski, S. (1993). When older adults face the chair-rise challenge: A study of chair height availability and height-modified chair-rise performance in the elderly. *Journal of the American Geriatric Society, 41*, 6–10.

This article was downloaded by: *[UATY Assistive Technology]*
On: *9 June 2010*
Access details: *Access Details: [subscription number 922452279]*
Publisher *Taylor & Francis*
Informa Ltd Registered in England and Wales Registered Number: 1072954 Registered office: Mortimer House, 37–41 Mortimer Street, London W1T 3JH, UK



### Assistive Technology

Publication details, including instructions for authors and subscription information:
http://www.informaworld.com/smpp/title~content=t910220176

## RESNA Position on the Application of Seat-Elevating Devices for Wheelchair Users

Julianna Arva[a]; Mark R. Schmeler[b]; Michelle L. Lange[c]; Daniel D. Lipka[d]; Lauren E. Rosen[e]
[a] TiLITE Corp., Kennewich, Washington, USA [b] Department of Rehabilitation Science & Technology, University of Pittsburgh, Pittsburgh, Pennsylvania, USA [c] Access to Independence, Inc., Arvada, Colorado, USA [d] Tobii Assistive Technology, Inc., Medina, Ohio, USA [e] St. Joseph's Children's Hospital of Tampa, Tampa, Florida, USA

To cite this Article Arva, Julianna , Schmeler, Mark R. , Lange, Michelle L. , Lipka, Daniel D. and Rosen, Lauren E.(2009) 'RESNA Position on the Application of Seat-Elevating Devices for Wheelchair Users', Assistive Technology, 21: 2, 69 — 72
To link to this Article: DOI: 10.1080/10400430902945587
URL: http://dx.doi.org/10.1080/10400430902945587

## PLEASE SCROLL DOWN FOR ARTICLE

Full terms and conditions of use: http://www.informaworld.com/terms-and-conditions-of-access.pdf

This article may be used for research, teaching and private study purposes. Any substantial or systematic reproduction, re-distribution, re-selling, loan or sub-licensing, systematic supply or distribution in any form to anyone is expressly forbidden.

The publisher does not give any warranty express or implied or make any representation that the contents will be complete or accurate or up to date. The accuracy of any instructions, formulae and drug doses should be independently verified with primary sources. The publisher shall not be liable for any loss, actions, claims, proceedings, demand or costs or damages whatsoever or howsoever caused arising directly or indirectly in connection with or arising out of the use of this material.

# Exhibit "B"

# Receipt
Tuesday, October 30, 2018

**National Seating & Mobility NE**
101 Fairchild Ave Ste 2
Plainview, NY 11803-1725
(516) 833-1797   FAX (516) 576-0011
NPI: 1003052598



| | | |
|---|---|---|
| **Client:** | **Caner Demirayak** | **Work Order:** **119-1575760** |
| **Address:** | 15 Sheep Pasture Lane | **Plan Name:** |
| | Massapequa NY  11758-2742 | **Group Number:** 755393 |
| **Model:** | | **Plan Number:** 949778484 |
| **Serial:** | | **Employer:** |
| | | **Resp Party:** |
| | | **Therapist:** Andrea Passannante |
| | | **RTS:** Gregg Blanchard |

## Equipment and Services

| | | | |
|---|---|---|---|
| 1 | Each | TDXSP2-MCG | TDX SP2 Base for Multi Actuator System - BASE MODEL |
| 2 | Pair | 24BATTERY | Group 24 Battery - BATTERIES |
| 1 | Each | | On Chair Cushion Credit |
| 1 | Each | ULMTR | Motion Concepts Ultra Low Maxx Tilt & Recline System - POWER POSITIONING SYSTEM |
| 1 | Each | AELM | Motion Concepts Add 12" Elevating Lift Seat, Single Power - POWER POSITIONING SYSTEM |
| 1 | Each | PM120AL | Expandable Controller |
| 1 | Each | PWH | Harness for Exp. System |
| 1 | Each | LC | Matrx-Libra 16-20", Single Power - SEAT CUSHION OPTIONS |
| 1 | Each | PBETR20 | Matrx Elite TR 20" High - UPGRADABLE BACK OPTIONS |
| 1 | Each | MEHSP-10 | Matrx Elan Standard Pad 10" - MATRX HEADREST PADS W/STD. COVER |
| 1 | Each | MEMAH | Elan Multi-Axis Removable Hardware |
| 1 | Each | MXFB-S | Straight 9.5-13" - RECLINE ARM REST |
| 1 | Each | MSTEX-LF | Modular Startex Covered Visco Foam, Left Full - ARM PADS |
| 1 | Each | MSTEX-RF | Modular Startex Covered Visco Foam, Right Full - ARM PADS |
| 1 | Each | MQRHL | MAXX Style Quick Release, Left - HARDWARE UPGRADE |
| 1 | Each | MQRHR | MAXX Style Quick Release, Right - HARDWARE UPGRADE |
| 1 | Each | LNX | Power Elevating Center Mount Foot Platform - POWERED CENTER MOUNT |
| 1 | Each | IFPL | Individual Footplate for LNX, Large - FOOTPLATE OPTION/CENTER MOUNT FOR LNX |
| 1 | Each | REM400 | Color 3.5" Touch Screen Remote - LINX ELECRONICS EXPANDABLE |
| 1 | Each | MTTDC | Function Key Multiple Actuator Systems Enabled - LINX ELECRONICS EXPANDABLE |
| 1 | Each | QUAD | Quad Link Swing-Away, Height Adjustable - MOUNTING FOR DRIVE CONTROLS |
| 1 | Each | | On Chair Back Credit |
| 1 | Each | MA-P-15A-P | 1.5" Auto Buckle - Single Pull Padded - 9" Pads |

*Payment towards estimated out of pocket costs.

## Additional Comments
50% down for denied items and co-ins

## Payment Information

Payment Type: Check   |   Check Number: 132

**Total Payment: $2,822.42**

# Receipt
Friday, November 16, 2018

### National Seating & Mobility NE
101 Fairchild Ave Ste 2
Plainview, NY 11803-1725
(516) 833-1797   FAX (516) 576-0011
NPI: 1003052598

| | |
|---|---|
| **Client:** Caner Demirayak | **Work Order:** 119-1575760 |
| **Address:** 15 Sheep Pasture Lane | **Plan Name:** |
| Massapequa NY  11758-2742 | **Group Number:** 755393 |
| **Model:** Invacare - Power TDX SP2 17-187 | **Plan Number:** 949778484 |
| **Serial:** 18KE000162 | **Employer:** |
| | **Resp Party:** |
| | **Therapist:** Andrea Passannante |
| | **RTS:** Gregg Blanchard |

## Equipment and Services

| | | | |
|---|---|---|---|
| 1 | Each | TDXSP2-MCG | TDX SP2 Base for Multi Actuator System - BASE MODEL |
| 2 | Pair | 24BATTERY | Group 24 Battery - BATTERIES |
| 1 | Each | | On Chair Cushion Credit |
| 1 | Each | ULMTR | Motion Concepts Ultra Low Maxx Tilt & Recline System - POWER POSITIONING SYSTEM |
| 1 | Each | AELM | Motion Concepts Add 12" Elevating Lift Seat, Single Power - POWER POSITIONING SYSTEM |
| 1 | Each | PM120AL | Expandable Controller |
| 1 | Each | PWH | Harness for Exp. System |
| 1 | Each | LC | Matrx-Libra 16-20", Single Power - SEAT CUSHION OPTIONS |
| 1 | Each | PBETR20 | Matrx Elite TR 20" High - UPGRADABLE BACK OPTIONS |
| 1 | Each | MEHSP-10 | Matrx Elan Standard Pad 10" - MATRX HEADREST PADS W/STD. COVER |
| 1 | Each | MEMAH | Elan Multi-Axis Removable Hardware |
| 1 | Each | MXFB-S | Straight 9.5-13" - RECLINE ARM REST |
| 1 | Each | MSTEX-LF | Modular Startex Covered Visco Foam, Left Full - ARM PADS |
| 1 | Each | MSTEX-RF | Modular Startex Covered Visco Foam, Right Full - ARM PADS |
| 1 | Each | MQRHL | MAXX Style Quick Release, Left - HARDWARE UPGRADE |
| 1 | Each | MQRHR | MAXX Style Quick Release, Right - HARDWARE UPGRADE |
| 1 | Each | LNX | Power Elevating Center Mount Foot Platform - POWERED CENTER MOUNT |
| 1 | Each | IFPL | Individual Footplate for LNX, Large - FOOTPLATE OPTION/CENTER MOUNT FOR LNX |
| 1 | Each | REM400 | Color 3.5" Touch Screen Remote - LINX ELECRONICS EXPANDABLE |
| 1 | Each | MTTDC | Function Key Multiple Actuator Systems Enabled - LINX ELECRONICS EXPANDABLE |
| 1 | Each | QUAD | Quad Link Swing-Away, Height Adjustable - MOUNTING FOR DRIVE CONTROLS |
| 1 | Each | | On Chair Back Credit |
| 1 | Each | MA-P-15A-P | 1.5" Auto Buckle - Single Pull Padded - 9" Pads |
| 1 | Each | LHS-M | Left - Hip Support & Pad, Medium - LATERAL HIP SUPPORTS |
| 1 | Each | RHS-M | Right - Hip Support & Pad, Medium - LATERAL HIP SUPPORTS |

*Payment towards estimated out of pocket costs.

## Additional Comments

Balance due for the denied items and copay

## Payment Information

Payment Type: Check   |   Check Number: 137

**Total Payment:  $2,822.42**